**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, DAVID COFLESKY, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device described in Attachment A-1 — which is currently in law enforcement possession (the "SUBJECT DEVICE"), and the extraction from that property of electronically stored information described in Attachment B-1.

2. I also make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a black 2008 Honda Accord, bearing New York passenger car registration, LHC 3343, (hereinafter the "SUBJECT VEHICLE" further described in Attachment A-2, for the things described in Attachment B-2.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 United States Code Sections 1343 (wire fraud); 1349 (wire fraud conspiracy); 2134 (interstate transportation of stolen property) have been

1

committed by **ANA C. DIAZ ADAMES** and others known and unknown. There is also probable cause to search the property described in Attachments A-1 and A-2 for evidence of these crimes as further described in Attachments B-1 and B-2.

## PROBABLE CAUSE

5. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been in this position since November 2024. I am also a Maine State Police Corporal and have been an officer since August 2011. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

6. On February 12, 2025, Maine State Police Trooper Liam Pusey was dispatched to a single vehicle crash on Interstate 95 Southbound in Biddeford. The vehicle involved was a black 2008 Honda Accord, bearing New York passenger car registration, LHC 33430 (the "SUBJECT VEHICLE").

7. Tr. Pusey arrived on scene and found the female operator, who was the lone occupant of the SUBBJECT VEHICLE, seated in the backseat collecting manilla envelopes and putting them into a purse. Tr. Pusey observed that the envelopes contained what appeared to be US currency, but he was unsure of how much or the denominations.

8. The female was transported to Maine Medical Center (MMC) in Portland for minor injuries, including a laceration to the head, sustained during the crash and she was transported with the currency.

9. Once at MMC, the female operator was identified as ANA C. DIAZ ADAMES, of Mount Vernon, NY.

10. As DIAZ ADAMES' injuries were being evaluated, MMC Security Officers documented the currency for safekeeping. MMC Security Officers advised Tr. Pusey that they estimated that DIAZ ADAMES had approximately $80,000 in currency.

11. Tr. Pusey contacted Maine State Police Sgt. Adam Schmidt, regarding the large amount of US currency. Sgt. Schmidt is assigned to the Maine Drug Enforcement Agency, (MDEA). Sgt. Schmidt and Maine State Police Sgt. Pappas responded to MMC, where they met with Tr. Pusey and DIAZ ADAMES. Sgt. Schmidt and Sgt. Pappas are both assigned to the Maine Drug Enforcement Agency ("MDEA").

12. Sgt. Schmidt and Sgt. Pappas entered DIAZ ADAMES hospital room. Sgt. Schmidt spoke with DIAZ ADAMES and she stated that she was hired by a bail bondsman and came to Maine to pick up cash for him.

13. Sgt. Schmidt and Sgt. Pappas advised DIAZ ADAMES that she was not under arrest and there were no charges pending at that time. Sgt. Schmidt and Sgt. Pappas then conducted a non-custodial interview with DIAZ ADAMES, who informed them that the currency she had was from collected "bail bonds". DIAZ ADAMES advised that she had never been to Maine before but had been directed to come to Maine to collect "bail bonds".

14. DIAZ ADAMES advised that she had been told to travel to the area of Gorham, Maine and await further instructions on where to go to collect the "bail bonds".

DIAZ ADAMES had gone to multiple residences in Maine that day and DIAZ ADAMES advised that she had been in Vermont the previous day, February 11, 2025, and had collected "bail bonds" there as well.

15.     DIAZ ADAMES advised that she would be provided with an address of a residence. She would then travel to that residence, and collect "bail bonds" from the resident, the money would go into an envelope marked with a case number and she would notify her higher ups that the bond had been collected, she would then provide the resident a confirmation number for the transaction and leave.

16.     While at MMC awaiting discharge, DIAZ ADAMES consented to a review of her cellphone (the "SUBJECT DEVICE").  Sgt. Schmidt observed text message communications on the phone between DIAZ ADAMES and unknown individuals regarding the collection of purported bail bonds.  Some of the communications to DIAZ ADAMES included directions on how she should dress, where to park her vehicle, the use of a COVID style mask (presumably to conceal her identity) and alternate names to provide to individuals who would be paying the purported bail bonds.

17.     After being evaluated for her injuries, DIAZ ADAMES was discharged from MMC and consented to go to the Maine State Police barracks in Gray, to continue the interview with Sgt. Schmidt and Sgt. Pappas regarding the origins of the currency.

18.     I was contacted by Sgt. Schmidt regarding the investigation.  I contacted Officer Kevin Rooney, a Canine Handler of the Kennebunk Police Department, to

conduct a free air sniff of the vehicle DIAZ ADAMES was operating, with his patrol K9 Aex. The vehicle had been towed from the crash scene to Ray's Towing in Saco, ME.

19. Officer Rooney responded to Ray's Towing and deployed K9 Aex around the vehicle. K9 Aex is a certified drug detection K9 and indicated a positive alert on the vehicle near the front end of the vehicle. The vehicle remains impounded at Ray's Towing.

20. At the Gray barracks, DIAZ ADAMES was advised of her Miranda Rights, after which she waived her rights and agreed to answer questions by Sgt. Schmidt and Sgt. Pappas. She again consented to the search of her cell phone and consented to the search of her vehicle.

21. DIAZ ADAMES advised that she became involved in collecting "bail bonds" through a male party she knew, DAMIAN SANCHEZ aka "Kurli".

22. DIAZ ADAMES advised that she would be provided with a location to go to, she would travel there and would meet with the resident of the address provided. That person had been previously contacted about their relative being in custody. They would provide DIAZ ADAMES with an agreed amount of currency in an envelope intended to pay the bail bond for a relative which they were told was in custody. DIAZ ADAMES advised she had done this the previous day in Vermont and had been to several residences in Maine that day.

5

23. During the interview with DIAZ ADAMES, Troopers continued to review the SUBJECT DEVICE. During this review, Troopers continued to find communications consistent with the collection of purported bail bonds by DIAZ ADAMES.

24. DIAZ ADAMES also advised that she would park her vehicle out of sight of the residences, and would provide a false name to these individuals, which was corroborated by text communications observed on her cell phone.

25. Based on their investigation, Maine State Police were able to identify one of the victims of the bail bond scheme in Auburn, Maine (hereinafter "Victim 1"). Maine State Police Corporal Ryan Phillips interviewed Victim 1, who stated that they had provided a woman with $19,000.00 to pay the "bail bond" of a relative. Subsequently, it was determined that DIAZ ADAMES was not authorized to collect any bail with respect to this relative.

26. At the Gray Barracks, DIAZ ADAMES advised the currency she had at the hospital was from money collected in Maine and she stated that there would be another $18,000.00 in the vehicle from money collected in Vermont.

27. During the interview, DIAZ ADAMES revoked consent to search her vehicle but did not revoke consent to search her cell phone. After DIAZ ADAMES had initially granted consent for the search, officers initiated a search of the vehicle. When DIAZ ADAMES revoked consent, the assisting officers were notified immediately, and search efforts on the vehicle ceased. No contraband or evidence items were observed by assisting officers during this brief search of the vehicle. DIAZ ADAMES, cell phone was

forensically downloaded after having received written consent from DIAZ ADAMES at the Gray barracks.

28. DIAZ ADAMES was issued a summons for Theft by Deception, she was transported back to Portland where she was dropped off to await her mother who was traveling to Portland.

29. On February 13, 2025, I contacted the Vermont State Police and the Colchester Vermont Police Department. I provided them with information concerning suspected victims of the bail bond scheme in Vermont, whose names and addresses had been observed in the SUBJECT DEVICE.

30. One of the suspected victims whose information was observed in the SUBJECT DEVICE is a resident of Charlotte, Vermont (hereinafter, "Victim 2"). At my request, Detective Sergeant David Hurwitch of the Vermont State Police ("VSP") conducted an interview of Victim 2 who stated that he had been contacted by phone by a female who identified herself as "Ashley Ricks." Ricks informed Victim 2 that his nephew had been involved in a car crash and the nephew had struck a seventeen-year-old pregnant female. The nephew was in custody and to get out of jail, he needed $20,000.00. Victim 2 advised that in addition to Ricks he spoke with a male who claimed to be his nephew. Victim 2 negotiated the price from $20,000.00 to $10,000.00, and informed Ricks that he had $5,000.00 at his house but needed to go to the bank for the rest. He was instructed to call Ricks at 802-267-7725 once he had the money and she would come and collect the bail. He was also instructed to put the

money in an envelope and mark it with the case number "TR-4002175. Victim 2 called the number once he had the $10,000.00. Thereafter, a female individual arrived at his residence, identified herself as Ashley Ricks, and collected the money and left.

31. Troopers observed text communications in the SUBJECT DEVICE in which DIAZ ADAMES was advised to use the name "Ahaley Ricks" and was provided with Victim 2's address.

32. Another suspected victim of the bail bond scheme whose name and address were observed in the SUBJECT DEVICE is a resident of Colchester, Vermont (hereinafter, "Victim 3"). I have been informed by Officer Lucas Mcclanahan of the Colchester Police Department, that he received a fraud complaint from Victim 3 on February 11, 2025. In this complaint, Victim 3 presented a similar story of a relative needing to be bailed out of custody and subsequently provided a woman with $8,000.00 for the purported bail.

33. Law enforcement has continued to investigate additional victims of the fraudulent scheme in Maine whose information was found in the SUBJECT DEVICE. Thus far, law enforcement has identified a victim in Portland who provided a woman believed to be DIAZ ADAMES with $14,000, and a victim in Skowhegan who provided a woman believed to be DIAZ ADAMES with $13,000. These victims each reported similar incidents in which they had been contacted regarding putting up bail for relatives and had then provided the cash to a woman.

34. The SUBJECT DEVICE is currently secured at the Office of the MDEA in Lewiston, Maine. The Subject Vehicle is currently secured on the premises of Ray's Towing, at 205 Bradley Street, Saco, Maine.

35. While DIAZ ADAMES had not revoked her consent to search the SUBJECT DEVICE, I am seeking this warrant as to the SUBJECT DEVICE out of an abundance of caution, and in case DIAZ ADAMES subsequently contacts law enforcement to revoke her consent.

## CONCLUSION

36. I submit that this affidavit supports probable cause for a warrant to search the SUBJECT DEVICE described in Attachment A-1 and seize the items described in Attachment B-1. I further submit that this affidavit supports probable cause for a warrant to search the SUBJECT VEHICLE described in Attachment A-2 and seize the items described in Attachment B-2.

## TECHNICAL TERMS

37. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless

9

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those

signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or

otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38. Based on my training, experience, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and how the device was used in furtherance of the crimes under investigation.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

40. *Forensic evidence.* As further described in Attachment B-1, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

j.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device

15

consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant as to the SUBJECT DEVICE seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant as to the SUBJECT DEVICE at any time in the day or night.

## CONCLUSION

43. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A-1 to seek the items described in Attachment B-2. I further submit that this affidavit supports probable cause for a warrant to search the SUBJECT VEHICLE described in Attachment A-2 and seize the items described in Attachment B-2.

Respectfully submitted,

DAVID COFLESKY
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Feb 14 2025

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title